J-S34028-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAMIEN CLAGON | : | |
| | : | |
| Appellant | : | No. 583 MDA 2021 |

Appeal from the Order Entered March 5, 2021
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0004045-2003

BEFORE: DUBOW, J., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED: FEBRUARY 7, 2022**

Damien Clagon appeals from the order dismissing as untimely his Post Conviction Relief Act ("PCRA") petition, 42 Pa.C.S.A. §§ 9541-9546. We affirm.

In November 2004, a jury found Clagon guilty of first-degree murder and firearms not to be carried without a license. 18 Pa.C.S.A. §§ 2501(a) and 6106(a). The trial court set forth the following factual history:

> The evidence at trial established that on March 28, 2003, between 2:00 and 2:30 a.m., a drug addict by the name of Joseph Meikle was walking the streets of Lancaster City in search of drugs. He came across an acquaintance by the name of Robert Travers, nicknamed "Newport." Travers testified that he, too, is a drug addict and that he and Meikle decided to combine their money to make one purchase of cocaine to share.
>
> As the two addicts approached the intersection of East End Avenue and South Marshall Street, they encountered a red Ford F-150 pickup truck. Travers recognized the driver as a street-level drug dealer known as "D" and "D-Cert" who had

once dated his cousin. "D" was talking on his cell phone in his truck and then suddenly turned his attention to Meikle. "D" became angry and started shouting, "what the f*** you looking at?" He repeated this question two or three more times. "D" then reached into the center console of the truck, pulled out a .357 revolver and exited his truck. Travers was yelling, "no, no" as "D" walked around the front of his truck, pointed his gun at Meikle and fired it, striking Meikle in the chest. Travers fled the scene and Meikle collapsed on the sidewalk and eventually died from the gunshot wound to his chest. The individual known as "D" and "D-Cert" was later identified as [Clagon].

John Calixto, a friend of [Clagon's] and a drug dealer, heard the gun shot about a block away and called [Clagon] on his cell. [Clagon] confirmed that he did the shooting and asked Calixto to pick him up in the parking lot of the American Bar and Grill. When [Clagon] got into Calixto's car, he was wearing a gray hooded sweatshirt and there was a gun protruding from his pocket. The two men drove around Lancaster City and eventually ended up at the Sixth Ward Park. As they were driving, [Clagon] detailed the shooting for Calixto.

After exiting the car, [Clagon] was last seen by Calixto walking towards the Turkey Hill convenience store at the corner of East Ross Street and New Holland Avenue. At 3:08 a.m., the video surveillance camera at the Turkey Hill shows [Clagon] walking into the store wearing the same gray hooded sweatshirt that Calixto said he was wearing when he picked him up shortly after the shooting.

Calixto testified that the next day he ran into [Clagon] on East End Avenue outside the home of Brian Pearson, [Clagon's] supplier. At that time, [Clagon] told Pearson and Calixto that he had to "stay low," "get his money together" and get out of town.

Jere Gilgore also testified for the Commonwealth. Gilgore was a crack addict who was letting [Clagon] live with him and drive his F-150 truck in exchange for drugs. At the time of this incident, Gilgore and his father owned a fabricating business near the American Bar and Grill in Lancaster City. Gilgore's apartment was in the fabrication building. Gilgore testified that the evening after the shooting, [Clagon] threw

the keys to his truck on the table and told Gilgore that he ([Clagon]) could not drive the truck anymore. Several hours later, [Clagon] returned to the apartment and told Gilgore about the shooting. He also returned Gilgore's gun, a Rossi .357 snub-nose two-and-a-half inch barrel, that had been used to kill Meikle. The day after the shooting, Gilgore rented a vehicle for [Clagon] and [Clagon] left town. [Clagon] returned to Lancaster on March 31, 2003, and spent the night at the Red Carpet Inn with his girlfriend, Kristen Mitchell. At approximately 2:30 a.m. on the morning of April 1, 2003, [Clagon] was arrested in his room on charges of receiving stolen property. He was taken to the Lancaster City Bureau of Police and processed. After receiving his **Miranda**[5] warnings, [Clagon] was interviewed by Detectives Kent Switzer and Jarrod Berkihiser. During this interview, [Clagon] stated that he had left for Brooklyn, New York, on Wednesday, March 26th and had not returned to Lancaster until Monday, March 31, 2003. Therefore, [Clagon] claimed he could not have been involved in the Meikle murder in the early morning hours of March 28th.

[5] **Miranda v. Arizona**, 384 U.S. 436 (1966).

. . .

[Clagon] took the stand in his own defense during the trial of his case. He admitted lying to the police about when he went to New York. In fact, he claimed that between 2:30 and 3:00 in the early morning of March 28th, he was in Lancaster meeting drug customers first at the corner of Lemon and Lime Streets and next at the McDonald's near McCaskey High School at the corner of Franklin Street and New Holland Avenue. After his drug transaction at the McDonald's, [Clagon] testified that he started walking to the Turkey Hill convenience store at the corner of East Ross Street and New Holland Avenue. Halfway there, [Clagon] encountered Calixto, whom [Clagon] described as his competitor, and had words with him about the drug deal at McCaskey. [Clagon] then entered the convenience store where he was captured on videotape by the store's surveillance system.

[Clagon] denied being at the corner of South Marshall Street and East End Avenue on Friday, March 28th at 2:30 a.m. He denied knowing an individual by the name of Joseph Meikle.

He denied having a motive to shoot Joseph Meikle and he denied shooting him. [Clagon] further testified that because his drug supply was running low, he had Gilgore rent him a car on Saturday, March 29, 2003, so he could drive to New York to hook up with his supplier. Circumstances prevented [Clagon] from connecting with his supplier so he called his girlfriend and invited her to join him in New York. On Monday, March 31st, [Clagon] and his girlfriend returned to Lancaster and got a room at the Red Carpet Inn, where he was arrested early the next morning.

Trial Court Opinion, filed Apr. 19, 2005, at 3-7 (citations to record omitted).[1]

In January 2005, the trial court sentenced Clagon to life imprisonment for the murder conviction and one to two years' imprisonment for the firearms conviction. This Court affirmed the judgment of sentence in November 2005 and the Pennsylvania Supreme Court denied Clagon's petition for allowance of appeal in June 2006.

Clagon has filed numerous PCRA petitions, including petitions where he claimed a trial witness, Trevor Bailey, fabricated his testimony. *See, e.g., Commonwealth v. Clagon*, Order, filed July 6, 2015, at n.1 (rejecting Clagon's argument that the Commonwealth offered the "unsubstantiated perjured testimony" of Bailey); *Commonwealth v. Clagon*, Order, filed Oct. 28, 2015, at n.1 (rejecting claim the Commonwealth offered "[b]artered, biasedly, manufactured, perjured testimony" of Bailey); *Commonwealth v. Clagon*, 1925(a) Opinion, filed Aug. 8, 2016, at 6-7 (finding Clagon failed to

---

[1] The trial transcripts are not included in the certified record in this appeal. However, the PCRA court and this Court have used this summary, or similar summaries, in prior opinions and memoranda. *See, e.g., Commonwealth v. Clagon*, Memorandum, filed Apr. 11, 2012, at 1-4 (quoting PCRA Ct. Op., filed Dec. 22, 2010, at 4-8).

prove the new facts related to Bailey's testimony were previously unknown to him or his failure to know them was due to government interference and finding any alleged concealment did not impact the verdict). At trial, Bailey testified for the Commonwealth regarding conversations he had with Clagon where Clagon spoke about the murder.

In November 2020, Clagon filed the subject PCRA petition, titled "Petition to Revisit Per Unfounded Offense and Unlawful Confinements." He claims the Commonwealth knowingly used false testimony to convict him. The court issued notice of its intent to dismiss the petition pursuant to Pennsylvania Rule of Criminal Procedure 907. Clagon filed a response. He attached to his response to the notice of intent to dismiss a printout of what he claims is an email from Bailey. The "From" line states, "Bailey, Trevor" and the Subject is "Dee," which is Clagon's nickname. Response to Rule 907 Notice, 12/21/20, at Exh.[2] In the purported email, Bailey states he "lied at your trial" and "made false statements" about what he knew and what Clagon told him. *Id.* The document states that Clagon[3] never told Bailey that he "committed a crime" and "actually told [him] several times . . . that [he] didn't kill dude and that that crack head dude was lying . . . to get out of his charges for robbing them stores." *Id.* The document also states that if Clagon needs

_____

[2] The document also lists a web address – lwebapp/jsps/cn/dashboard/dashboard.cn.

[3] The body of the email does not state Clagon's name, but, based on the context, we infer that the writer of the document is referring to Clagon.

him to help, "please let [him] know and [he is] willing to help any way [he] can." ***Id.*** There is a notary signature and stamp at the bottom and a separate signature, but not Trevor Bailey's signature.

In March 2021, the court dismissed the petition as untimely. After being granted leave to file an appeal *nunc pro tunc*, Clagon timely filed an appeal.

Clagon raises the following issues on appeal, which we repeat verbatim:

> I) Did the lower court not err and abuse its discretion when it inaccurately, and biasedly disregarded timely presented information of after discovered false testimony relied upon for conviction in the instant case, based on their unproven, personal "hunch" that said after discovered evidence may have been "doctored" [simply because it was presented in email format] . . . without a prior hearing to discern the credibility of presented facts?

> II) Did the PCRA court not err and abuse its discretion when it asserted the "factual impossibility" that Appellant had previously argued after discovered <u>admitted false</u> testimony, that such had already been "made clear" to the jury. . ., and therefore was not presenting after discovered evidence, without exercising a hearing to properly discern as much?

> III) Did the PCRA court not err and abuse its discretion when biasedly reclassifying Appellant's contentions, inaccurately asserting Appellant was "arguing recanted testimony" despite aft. disc. evi. specifying fabricated, false testimony was knowingly exhibited to the jury; relied upon for conviction? One cannot recant; "retell" an admittedly fabricated tale, can they?

> IV) Did the PCRA court not err and abuse its discretion by disregarding facts [of confession] in aft. disc. evi., biasedly asserting that it somehow knows what [Commonwealth jail-house informant] Bailey would do (confess to); know what Bailey would do in the face of a perjury charge despite aft. disc. evi. clearly stating Bailey is willing to help in <u>any</u> way that he could?

V) Did the lower court not err and abuse its discretion when it inaccurately and falsely stated after discovered evidence; email lacked an address, despite the fact that the upper left hand corner of said (included) email displays address; website, email network, and provider? In turn, the lower court also falsely contended that no information existed which states Bailey sent said email, despite said email containing all the necessary information to verify; track sender of email, and it prominently stating on the face of said email that Bailey is, in fact, the sender?

VI) Did the lower court not err and abuse its discretion when it falsely asserted Appellant failed to contend his innocence, despite documentation presented to the lower court explaining how without Baileys false offering no information of an offense of murder existed in record of the instant trial? It is elementary that this is the reason the lower court stated that "even without Bailey there still existed an offense of murder" (albeit false)? See also, summary of argument, infra.

VII) Lastly, did the lower court not err and abuse its discretion when falsely asserting that Appellant "cannot" show that even if Baileys falsities were known [and believed] such still would not have changed the result of conviction for murder in the instant case. . . without the benefit of a hearing, and despite facts presented to the lower court [in aft. dis. evi. documentation] displaying that an offense of murder would be lawfully unfounded upon the proper omission of Baileys admittedly false, insidious offering? See VII, infra.

Clagon's Br. at 2-3 (brackets in original).

We review an order denying a PCRA petition to determine "whether the record supports the PCRA court's determination, and whether the PCRA court's determination is free of legal error." *Commonwealth v. Phillips*, 31 A.3d 317, 319 (Pa.Super. 2011). A timely petition is one that a petitioner has filed within one year from the judgment of sentence becoming final. A judgment of sentence is final "at the conclusion of direct review, including discretionary

review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." 42 Pa.C.S.A. § 9545(b)(3). After the one-year deadline expires, a petitioner must plead and prove at least one of the time-bar exceptions. These exceptions are:

> (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
>
> (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or
>
> (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

*Id.* at § 9545(b)(1)(i)-(iii). A petitioner must raise the claim within one year from the time the claim could have been raised. *Id.* at § 9545(b)(2). To qualify for the new fact exception, "a petitioner need only establish that the facts upon which the claim is based were unknown to him and could not have been ascertained by the exercise of due diligence." ***Commonwealth v. Burton***, 158 A.3d 618, 629 (Pa. 2017).

Where a petitioner seeks an evidentiary hearing, the petition must include "a certification signed by each intended witness stating the witness's name, address, date of birth and substance of testimony and shall include any documents material to that witness's testimony," or "a certification, signed by

the petitioner or counsel, stating the witness's name, address, date of birth and substance of testimony." 42 Pa.C.S.A. § 9545(d)(i)-(ii). Failure to substantially comply with the certification requirements renders the proposed witness's testimony inadmissible. *Id.* at § 9545(d)(1)(iii).

Clagon's judgment of sentence became final in September 2006, 90 days after the Pennsylvania Supreme Court denied his petition for allowance of appeal and when his time to seek *certiorari* from the Unites States Supreme Court expired. *See* U.S.Sup.Ct.R. 13 (allowing 90 days to file a petition for writ of *certiorari* with the United States Supreme Court). Therefore, he had until September 2007 to file a timely PCRA petition and his petition, filed in November 2020, is untimely.

Clagon claims he satisfied the new fact exception. *See* 42 Pa.C.S.A. § 9545(b)(1)(ii). He argues the court abused its discretion by discrediting the email, which he alleges contained all necessary information to verify its authenticity. He claims the PCRA court should have held an evidentiary hearing to verify its authenticity or appointed counsel to assist him in preparing an affidavit. Clagon claims he attempted to draft the evidence in affidavit form but was disallowed. He claims that in the past he had only "surmised" that Bailey may have offered false testimony. In contrast, this time he had "proof." Clagon's Br. at 7. He argues it was error for the court to claim it knew what Bailey would do in relation to a perjury charge, noting that the

email states Bailey would be willing to help in any way.[4] He further claims that without Bailey's testimony at trial, there would have been know information that Clagon had previous knowledge of the victim or a plan to harm him.[5]

Here, the PCRA court concluded Clagon failed to establish the new fact exception, as he presented only an unauthenticated email and made no assertion Bailey would be available and willing to testify:

> The new evidence Clagon presents in the form of an unauthenticated email is inherently not credible and therefore problematic. The proffered email is not a sworn affidavit.[15] In fact, Clagon makes no assertion that Bailey himself would be available and willing to subject himself to the criminal charge of perjury by testifying to this recantation under oath.[16] As such, the printout of the email itself is the extent of Clagon's "new" evidence and the email itself lacks any indicia of credibility. No email addresses appear on the printout, making it impossible to know whether Bailey himself actually sent the email and to whom it was sent. Damien Clagon's name is never mentioned in the body of the email. Clagon offers nothing other than his own assertions that the email was actually written by Bailey and that the recantation is, in fact, authentic. In our electronic age, this evidence could have been fabricated by anyone and made to appear to have come from Bailey. The Court finds it highly unlikely that Bailey, who admitted on cross-examination at trial to testifying in hopes of receiving favorable treatment from the Commonwealth on his own

---

[4] Clagon further claims the court erred in stating the email did not have an address on it, had no assertion it was from Bailey, and never mentioned Clagon. He claims the address, email provider, and sender of the email are apparent on the face of the email. He further claims Bailey refers to Clagon as "Dee." Clagon's Br. at 10. We note the document contains a URL, but no email address, mailing address, phone number, or date of birth for the sender.

[5] Clagon further claims that the court erred in stating he did not maintain his innocence. He states that, without Bailey's testimony, there was only evidence that he acted in self-defense.

pending criminal charges,[17] would at this late date subject himself to a charge of perjury on Clagon's behalf.

[15] Although the printed email does have a notary's seal at the bottom, Clagon provides no explanation for why this notarization appears and whose handwriting or signature seems to have been placed at the bottom. It would be pure conjecture for the Court to assign any meaning to this signature and notarization.

[16] Although the email states "I'm willing to help any way I can," nowhere does the sender offer to testify under oath. A significant difference exists between a willingness to write an email with a recantation and a willingness to expose oneself to criminal prosecution by admitting under oath that one has previously lied under oath.

[17] For example, *see* Notes of Transcript ("N.T.") for the trial, where Clagon's attorney cross examined Bailey regarding his pending criminal charges: "Do you hope to get help with charges in exchange for your testimony?" Bailey responded: "I was hoping that it would be taken into consideration." (N.T., Trial at 337.) This testimony establishes that in 2004 Clagon knew (1) Bailey had criminal charges pending against him at the time of his testimony against Clagon, and (2) Bailey and the Commonwealth had no agreement regarding those pending charges in exchange for his testimony, but that Bailey hoped for some consideration.

PCRA Court Opinion, filed Mar. 5, 2021, at 10-11.

The court's findings are supported by the record, and it did not err in finding Clagon failed to plead a time-bar exception and failed to establish a hearing was necessary. Any claim that the PCRA court ought to have appointed counsel fails because this was not Clagon's first PCRA petition and no hearing was required. *See* Pa.R.Crim.P. 904(D). Clagon did not include an affidavit from Bailey with the relevant information sufficient to justify a

hearing. Contrary to his assertion, the email does not contain information sufficient to authenticate the contents. A document that Clagon purports to be from a trial witness, without identifying information or authentication, does not constitute a new fact. Accordingly, Clagon did not plead and prove a time-bar exception.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/7/2022